IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHESAPEAKE APPALACHIA,    :         4:14-CV-0620
L.L.C.,                           :
                                :
        Plaintiff,          :         (Judge Brann)
    v.                       :
                                  :
SCOUT PETROLEUM, LLC, and   :
SCOUT PETROLEUM II, LP,    :
                                :
        Defendants.      :

**M E M O R A N D U M**

December 19, 2014

## I. BACKGROUND:

The principal basis upon which a court may support its reasoning for granting a motion for reconsideration is an intervening change in the controlling law. In this case, Defendants ask the Court do the opposite and reconsider the undersigned's application of a recent change in the controlling law, and, instead, revert to the former state of the law. The Court cannot ignore the current state of the law in this federal circuit. The motion will be denied.

*Procedural History:*

Plaintiff, Chesapeake Appalachia, LLC, hereinafter "Chesapeake," commenced the instant civil action on April 1, 2014, against defendants, Scout Petroleum, LLC and Scout Petroleum II, LP (hereinafter, collectively, "Scout").

The two-count complaint was filed after Scout had initiated arbitration proceedings against Chesapeake with the American Arbitration Association        (hereinafter "AAA").  Count I is a demand for a declaratory judgment requesting that the court decide whether the court or the arbitrator is tasked to interpret the contract, commonly referred to as the "who decides" question. Count II is a demand for a declaratory judgment contending that the contract does not permit class arbitration, commonly referred to as the "clause construction" question.

On April 4, 2014, three days after the complaint was filed, Chesapeake filed a Motion for Summary Judgment on Count I of the complaint, requesting that this Court enter an Order directing that it is the Court who answers the "who decides" question.  On April 29, 2014, Scout filed a Motion to Dismiss requesting, alternatively, that the Court enter an Order holding that an arbitration panel from the American Arbitration Association decide this "who decides" question.

Subsequently, on June 4, 2014, the parties contacted the Court and requested expedited handling of the respective motions.  On June 10, 2014, the Court held a telephone conference call with counsel for the parties at the conclusion of which the Court agreed to a reasonably rapid resolution of the pending motions. Accordingly, the Court put to the side other motions on a very full civil docket and commenced the research necessary to resolve the question at hand.

As it happens, the "who decides" issue is an unsettled area of law in the class arbitrability arena.  The United States Court of Appeals for the Third Circuit had, prior to July 30, 2014, indicated that the arbitrator should decide such a question, although it was clear that the United States Supreme Court was incrementally shifting its thinking in the direction of concluding that courts, rather than arbitrators, should decide this threshold question.  This Court had a finalized Memorandum Opinion and Order, which detailed its approach to this unsettled area of law, ready to docket in early August 2014.

On July 30, 2014, however, the Third Circuit issued a decision that altered the state of the law in this circuit.  *See Opalinski v. Robert Half Int'l Inc.,* 761 F.3d 326 (3d Cir. 2014).  The Third Circuit has now held that, in the absence of clear and unmistakable evidence to the contrary,  the district courts decide the "who decides" issue.

Following the Third Circuit's seminal decision in *Opalinski*, this Court began to draft a new, now revised, Memorandum Opinion and Order on the "who decides" issue.  During this time, however, the parties, without either contacting the Court or waiting for the Court to act, proceeded before an arbitration panel on the questions of both who decides as well as the question of arbitrability.  The arbitration panel decided that it, not this Court, decides the "who decides"

3

question, and went on to decide the "clause construction" question by determining that the contract permitted class arbitration. On October 14, 2014, Scout notified the Court that the AAA arbitration panel had entered this decision

In response, also docketed October 14, 2014, Chesapeake filed two further motions - a Motion to Vacate, ECF No. 44, and a Motion to Stay/Expedite, ECF No. 46.  By Order dated October 16, 2014, the Court summarily Ordered that Plaintff's Motions for Summary Judgment and to Vacate the Arbitration Panel Award be granted and Defendants' Motion to Dismiss be denied citing to the controlling precedent generated three months before in *Opalinski*.

On October 30, 2014 Scout filed a Motion for Reconsideration. ECF No. 50. This motion has now been fully briefed.  Subsequently, on December 5, 2014, Scout filed an unexpected Motion to Vacate and for Recusal.  ECF No. 55. Following oral argument conducted on December 10, 2014, the matter is now ripe for disposition.  For the reasons that follow, the Defendants' motions will be denied.

## II.  DISCUSSION:

## A. Motion for Reconsideration Standard

"The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." *Harsco v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985).  A court should grant a motion for reconsideration if the party seeking reconsideration shows: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).

"A motion for reconsideration is not properly grounded on a request that the Court simply rethink a decision it has already made." *Douris v. Schweiker*, 229 F. Supp. 2d 391, 408 (E.D. Pa. 2002).  In such a motion, "parties are not free to relitigate issues that the Court has already decided." *United States v. Jasin*, 292 F. Supp. 2d 670, 676 (E.D. Pa. 2003) (internal citation and quotations omitted).  "The standard for granting a motion for reconsideration is a stringent one . . . . [A] mere disagreement with the court does not translate into a clear error of law." *Mpala v. Smith*, CIV. 3:CV-06-841, 2007 WL 136750, *2 (M.D. Pa. Jan. 16, 2007) (Kosik, J.) *aff'd*, 241 F. App'x 3 (3d Cir. 2007).  "Because federal courts have a strong interest in the finality of judgments, motions for reconsideration should be granted

5

sparingly." *Cont'l Cas. Co. v. Diversified Indus., Inc.*, 884 F. Supp. 937, 943 (E.D. Pa. 1995).

## B. Allegations in the Complaint

As noted above, Plaintiff, Chesapeake Appalachia, L.L.C. (hereinafter "Chesapeake"), filed a complaint in the Middle District of Pennsylvania on April 1, 2014.  ECF No. 1.  The complaint is for declaratory and injunctive relief against Defendants, Scout Petroleum L.L.C and Scout Petroleum II, L.P. (hereinafter, collectively, "Scout").

In 2008, Chesapeake entered into various Paid-Up Oil & Gas Leases with landowners in several northeastern Pennsylvania counties to explore for, and produce natural gas from, the landowners property.  The leases at issue are typical natural gas leases, in which there is a basic boilerplate form contract, often together with an individually negotiated addendum.  In 2013, Scout purchased the right to some of the leases from certain landowners and has been receiving royalties from Chesapeake on the gas produced by Chesapeake.

On March 17, 2014, Scout sought to commence a class arbitration against Chesapeake.  Scout's attempt to pursue class arbitration is on behalf of themselves, together with a putative class of thousands of landowners.  The claims deal with the calculation of royalties under the terms of the natural gas leases.

6

The leases contain the following arbitration provision:

> ARBITRATION.  In the event of a disagreement between Lessor and Lessee concerning this Lease, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association.  All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

ECF No. 1 at 7 citing Ex. A at SCOUT I-000181.

Chesapeake asserts that the above-cited lease term does not provide for, or otherwise contemplate class arbitration; instead it contemplates only individual arbitration.  Chesapeake filed the instant action for equitable relief in this Court in order to have the Court declare both that the matter of class arbitration is one for the Court and not the arbitrator to decide, and that class arbitration is not available under the lease.

## C.  Analysis

### 1.  Plaintiff's Partial Motion for Summary Judgment and Defendants' Motion to Dismiss

The rocky path the issue of class arbitrability has traversed over the years began eleven years ago with the United States Supreme Court's plurality decision in *Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444, 123 S. Ct. 2402, 156 L.Ed.2d 414 (2003).  Green Tree Financial Corporation was a commercial lender operating in South Carolina. *Id.* at 447.  Green Tree had contracted with the

Bazzles (and others[1]) for a residential loan. *Id.* at 447-449.  The contract contained

an arbitration clause which stated, in salient part, that "All disputes, claims, or

controversies arising from or relating to this contract or the relationships which

result from this contract...shall be resolved by binding arbitration by one arbitrator

selected by us with consent of you." *Id.* at 448.  A dispute arose, and the Bazzles

filed an action in a South Carolina state court asking the court to certify their

claims and a class action.  *Id.* at 449. Green Tree asked the court to compel

arbitration.  *Id.* The court granted both requests and the matter proceeded to class

arbitration. *Id.*  After a loss at arbitration, Green Tree appealed the arbitrator's

decision. *Id.* The South Carolina Supreme Court held that the contracts were silent

as to class arbitration, and that the contract consequently authorized class

arbitration.  *Id.* At 450.

A plurality of the United States Supreme Court (Justices Breyer, Scalia,

Souter and Ginsburg) held that the issue of whether or not the contracts were silent

as to class arbitration was a matter for the arbitrator to decide, not the courts.

*Bazzle* 539 U.S. at 447.  The plurality described it as a "preliminary question." *Id.*

at 450. The Court stated that "[u]nder the terms of the parties' contracts, the

---

[1]The Supreme Court also took up this action on appeal from another set of
respondents, but for the sake of clarity here, this Court will only refer to the
Bazzles.

question - whether the agreement forbids class arbitration - is for the arbitrator to decide." *Id.* at 451.  The Court found that the parties had agreed that an arbitrator would answer the question of whether a class was authorized under the contract because in the contract the parties agreed that "all disputes, claims, or controversies arising from or relating to this contract or the relationships which result from this contract." *Id.*  The plurality interpreted the contract to mean that the interpretation of the contract was a task intended for the arbitrator, not the courts.  As a policy matter, the plurality added that "if there is doubt about that matter - about the "scope of arbitrable issues' - we should resolve that doubt "in favor of arbitration." *Id.* at 452 *citing Mitsubishi Mothers Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626, 105 S. Ct. 3346, 87 L.Ed.2d 444 (1985).

The *Bazzle* plurality went on to explain the "certain limited circumstances" in which the courts will assume that the parties intended the court, and not an arbitrator, "to decide a particular arbitration-related matter." *Bazzle* 539 U.S. at 452.  These circumstances being "gateway matters, such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy." *Id.*

The *Bazzle* court stated that whether or not the contract forbids class arbitration did not fall into that narrow exception. *Bazzle* 539 U.S. at 452.  The

plurality also stated that the question presented was the "kind of arbitration proceeding the parties agreed to," which was a question of contract interpretation – a matter for the arbitrator, not the courts, to decide. *Id.* at 453.

In order to have a controlling judgment of the court, Justice Stevens concurred in the plurality's decision. *Bazzle* 539 U.S. at 455. In his three paragraph concurrence, Justice Stevens stated that the arbitrator, not the South Carolina court, should have interpreted the agreement in the first instance. *Id.* Because his view was in agreement with the plurality decision stating that the arbitrator should have performed the contractual interpretation, he concurred in the judgment in order to have a controlling judgment of the court, although his preferred outcome would be to simply affirm the judgment of the Supreme Court of South Carolina, as he believed that the decision was correct as a matter of law. *Id.*

Chief Justice Rehnquist, together with Justices O'Connor and Kennedy dissented stating that the determination "that arbitration under the contracts could proceed as a class action [sic] even though the contracts do not by their terms permit class-action arbitration...is one for the courts, not for the arbitrator." *Bazzle* 539 U.S. at 455-6. The dissenters went on to write that "the decision of what to submit to the arbitrator is a matter of contractual agreement by the parties, and the

interpretation of that contract is for the court, not for the arbitrator." *Id.*   The

dissenting opinion in *Bazzle* would interpret the contract's lack of a clear statement

of intent to submit to class arbitration as an agreement not to submit to class

arbitration, but only an agreement to submit to bilateral arbitration; the dissent

would not coerce the parties to engage in class arbitration.

Justice Thomas, separately dissenting, would have left the decision of the

Supreme Court of South Carolina untouched.   He concluded that the Federal

Arbitration Act (FAA) would not apply to the proceeding in state court.

A plural majority decision certainly makes the task of the lower courts more

difficult.   In the area of class arbitrability, the waters were muddied even further as

the Supreme Court issued subsequent decisions that eroded the already tenuous

pronouncement in *Bazzle.*

In 2010 and 2013, the Supreme Court decided two cases with different

questions presented than those considered in *Bazzle.*   Nevertheless, in the dicta in

those later cases, the Supreme Court  poked holes in the *Bazzle* decision.  *See Stolt-*

*Nielsen v. Animal Feeds Int'l Corp.,* ___ U.S. ___, 130 S. Ct. 1758, 176 L. Ed. 2d

605 (2010) and *Oxford Health Plans LLC v. Sutter,* ___U.S. ___, 133 S. Ct. 2064,

186 L. Ed. 2d 113 (2013).   As the United States Court of Appeals for the Sixth

Circuit so aptly described it, "[a]lthough the Supreme Court's puzzle of cases on

this issue is not yet complete, the Court has sorted the border pieces and filled in much of the background." *Reed Elsevier Inc. v. Crockett*, 734 F.3d 594 (6th Cir. 2013) *cert. denied sub nom. Crockett v. Reed Elsevier, Inc.*, 134 S. Ct. 2291, 189 L. Ed. 2d 173 (2014) .

First, in *Stolt-Nielsen, supra,* the Court acknowledged that *Bazzle* had "baffled the parties." 130 S. Ct. at 1772.   While *Stolt-Nielsen* presented a different question than did *Bazzle*, the Supreme Court began to undermine *Bazzle's* influence by stating in dictum, "*[O]nly* the plurality decided that question [which decision maker (court or arbitrator) should decide whether the contracts in question were "silent" on the issue of class arbitration]. But we need not revisit that question here..." 130 S. Ct. at 1771-2 (emphasis added).

The question presented to the court in *Stolt-Nielsen* was "whether imposing class arbitration on parties whose arbitration clauses are "silent" on that issue is consistent with the Federal Arbitration Act (FAA)." 130 S. Ct. At 1764.  Although at first blush the issue presented appears to be identical to *Bazzle*, *Stolt-Nielsen* is distinguishable because during the pendency of the litigation, the parties entered into a supplemental agreement providing for the question of class arbitration to be submitted to a panel of three arbitrators.  *Id.* at 1765.  Petitioners appealed the arbitration panel's decision that the action should proceed as a class arbitration.  *Id.*

at 1766.  The *Stolt-Nielsen* court reversed the lower court's decision as it found

that the arbitration panel "exceeded its powers" pursuant to § 10(b) of the FAA; the

panel had imposed its own view of sound policy regarding class arbitration, rather

than simply interpreting and applying the agreement.  *Id.* At 1767-8.

The *Stolt-Nielsen* arbitration panel had naturally based much of their

reasoning on *Bazzle*.  The Supreme Court attempted to provide insight into its

rationale in *Bazzle*, stating:

> Unfortunately, the opinions in *Bazzle* appear to have baffled the parties
> in this case at the time of the arbitration proceeding.  For one thing, the
> parties appear to have believed that the judgment in *Bazzle* requires an
> arbitrator, not a court, to decide whether a contract permits class
> arbitration. [] In fact, however, only the plurality decided that question.
> But we need not revisit that question here because the parties'
> supplemental agreement expressly assigned this issue to the arbitration
> panel, and no party argues that this assignment was impermissible.

*Stolt-Nielsen,* 130 S. Ct. at 1772.

"As we have explained, however, *Bazzle* did not establish the rule to be

applied in deciding whether class arbitration is permitted."  *Stolt-Nielsen*, 130 S.

Ct. at 1772.  "[T]he FAA imposes certain rules of fundamental importance,

including the basic precept that arbitration "is a matter of consent, not coercion."

*Id. citing Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford

Junior Univ.*, 489 U.S. 468, 479, 109 S. Ct. 1248, 103 L.Ed.2d 488 (1989).  "Under

13

the FAA, a party to an arbitration agreement may petition a United States district court for an order directing that "arbitration proceed in the manner provided for in such agreement." *Stolt-Nielsen*, 130 S. Ct. at 1773, *citing* 9 U.S.C. § 4.

"From these principles, it follows that a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Stolt-Nielsen*, 130 S. Ct at 1775 (emphasis in original). "An implicit agreement to authorize class-action arbitration, however, is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate." *Id.* "This is so because class-action arbitration changes the nature of arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator." *Id.*

"In bilateral arbitration, parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes" *Id.* "But the relative benefits of class-action arbitration are much less assured, giving reason to doubt the parties' mutual consent to resolve disputes through class wide arbitration." *Id.* at 1775-6.

14

Consider just some of the fundamental changes brought about by the shift from bilateral arbitration to class-action arbitration. An arbitrator chosen according to an agreed-upon procedure, no longer resolves a single dispute between the parties to a single agreement, but instead resolves many disputes between hundreds or perhaps even thousands of parties. Under the Class Rules, the presumption of privacy and confidentiality that applies in many bilateral arbitrations shall not apply in class, thus potentially frustrating the parties' assumptions when they agreed to arbitrate. The arbitrator's award no longer purports to bind just the parties to a single arbitration agreement, but adjudicates the rights of absent parties as well. And the commercial stakes of class-action arbitration are comparable to those of class-action litigation. We think that the differences between bilateral and class-action arbitration are too great for arbitrators to presume, consistent with their limited powers under the FAA, that the parties' mere silence on the issue of class-action arbitration constitutes consent to resolve their disputes in class proceedings.

*Stolt-Nielsen*, 130 S. Ct. at 1776 (internal citations and quotations omitted).

Following this rather significant decision, the United States Court of Appeals for the Third Circuit, decided three cases that appear to have adopted the *Bazzle* plurality's decision, without expressly holding as such, together with a consideration of the breadth of the *Stolt-Nielsen* decision. These cases are, *Vilches v. The Travelers Companies, Inc.,* 413 Fed. Appx. 487 (3d Cir. 2011) (not-precedential); *Sutter v. Oxford Health Plans* 675 F.3d 215 (3d Cir. 2012); and *Quilloin v. Tenent Health System*, 673 F.3d 221 (3d Cir. 2012).

In *Vilches*, a group of insurance appraisers filed a class action in state court against their insurance company employer; the district court held that the parties

agreement was to arbitrate and ordered bilateral arbitration. 413 Fed. Appx. at 490. The Third Circuit held that the determination of whether or not the employees could bring the action as a class arbitration was a question for the arbitrator to answer based on the parties' agreements. *Id*. At 489.

When hired, the insurance appraisers agreed to an employment provision that made arbitration the forum for all disputes. *Vilches,* 413 Fed. Appx. at 489. The agreement was silent as to class arbitration. *Id*. In April 2005 (possible as a response to the *Bazzle* decision) defendant Travelers Insurance Company published a revised policy, which explicitly disallowed class arbitration. *Id*. The dispute before the district court concerned whether or not the employees should be bound by this amended policy. *Id*. The district court engaged in an interpretation of the contract and its amended policy and determined that the action could only proceed as a bilateral arbitration. *Id*.

The Third Circuit disagreed with the lower court, stating "[t]he parties agree that any and all disputes arising out of the employment relationship - including the claims asserted here - are to be resolved in binding arbitration...the district court should not have decided the issue presented as to the class action waiver...we will refer the resolution of this question to arbitration in accordance with governing jurisprudence." *Vilches* 413 Fed. Appx. at 491. The Third Circuit noted that

despite how the parties framed the question presented to the court, "the relevant question here is *what kind of arbitration proceeding* the parties agreed to. *Id. citing Bazzle*, 539 U.S. at 452.  The Third Circuit went on to state "[w]here contractual silence is implicated, "the arbitrator and not a court should decide whether a contract [was] indeed silent" on the issue of class arbitration and "whether a contract with an arbitration clause forbids class arbitration."  *Id. citing Stolt-Nielsen,* 130 S. Ct. at 1758.  "Accordingly, we must "give effect to the contractual rights and expectations of the parties," and refer the questions of whether class arbitration was agreed upon to the arbitrator. *Id. citing Stolt-Nielsen,* 130 S. Ct. at 1774.

The next decision from the Third Circuit presented the same procedural posture as did *Stolt-Nielsen.*  In *Sutter v. Oxford Health Plans* (the prelude to the Supreme Court's *Oxford Health Plans v. Sutter ,* ___U.S. ___, 133 S. Ct. 2064, 186 L. Ed. 2d 113 (2013)), the district court determined that an arbitrator should determine whether the parties' agreement allowed for class arbitration.  675 F.3d 215, 217 (3d Cir. 2012).  The arbitrator construed the clause "no civil action concerning any dispute arising under this agreement shall be instituted before any court" to encompass all court actions, including class actions, and that to carve out an exception for class arbitration would negate the reading of the clause.  *Id.* At

17

218.   Oxford appealed the arbitration as an excess of the arbitrator's powers.   The *Stolt-Nielsen* decision was handed down and Oxford appealed the decision a second time.   *Id.*

The Third Circuit found that none of the factors delineated by the FAA at 9 U.S.C. §10(a) existed that would allow the court to vacate an arbitration award. *Sutter*, 675 F.3d at 219.   The Third Circuit clarified that *"Stolt-Nielsen* did not establish a bright line rule that class arbitration is allowed only under an arbitration agreement that incants "class arbitration" or otherwise expressly provides for aggregate procedures." *Id.* at 222.  "Instead, *Stolt-Nielsen* established a default rule under the Federal Arbitration Act: "[A] party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Id.* (Internal citation omitted).

The Third Circuit distinguished the *Sutter* arbitration agreement from the *Stolt-Nielsen* agreement, in that it found that the *Sutter* agreement was not silent as to arbitration.  *Id.* The Court found that there was a contractual basis for the arbitrator to have concluded that the agreement intended to encompass class arbitration. *Id.* at 223.

Finally, the Third Circuit decided *Quilloin v. Tenent Heath System Philadelphia, Inc.,* 673 F.3d 221 (3d. Cir. 2012). In that decision, the Third Circuit

stated, while citing to *Stolt-Nielsen*, that "[s]ilence regarding class arbitration generally indicates a prohibition against class arbitration, but the actual determination as to whether class action is prohibited is a question of procedure for the arbitrator." *Id.* At 232.

After the Third Circuit adopted what appeared to be the Supreme Court's view that the task of interpreting whether or not a contract requiring arbitration also permits class arbitration is a one for the arbitrator, the Supreme Court modified that approach even further in its review of *Oxford Health Plans, LLC. v. Sutter* on appeal from the Third Circuit. __ U.S. __, 133 S. Ct. 2064, 186 L. Ed. 2d 113 (2013). The Supreme Court held that the arbitrator's decision that the contract permitted class arbitration survived the limited judicial review set forth in § 10(a)(4) of the FAA. However, despite this singular question presented, the Supreme Court added a remarkable footnote that dilutes the *Bazzle* plurality:

> We would face a different issue if Oxford had argued below that the availability of class arbitration is a so-called "question of arbitrability." Those questions – which "include certain gateway matters, such as whether parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy"– are presumptively for courts to decide. *Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444, 452, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003) (plurality opinion). A court may therefore review an arbitrator's determination of such a matter de novo absent "clear[ ] and unmistakabl[e]" evidence that the parties wanted an arbitrator to resolve the dispute. *AT & T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). *Stolt-Nielsen*

19

made clear that this Court has not yet decided whether the availability of class arbitration is a question of arbitrability. *See* 559 U.S., at 680, 130 S.Ct. 1758. But this case gives us no opportunity to do so because Oxford agreed that the arbitrator should determine whether its contract with Sutter authorized class procedures. *See* Brief for Petitioner 38, n. 9 (conceding this point). Indeed, Oxford submitted that issue to the arbitrator not once, but twice – and the second time after *Stolt-Nielsen* flagged that it might be a question of arbitrability.

*Id. at* 2068.

The Sixth Circuit was the first circuit court to move toward the anticipated future path of the Supreme Court with its decision in *Reed Elsevier, Inc. v. Crockett* 734 F.3d 594 (6th Cir. 2013), stating that "recently the [Supreme] Court has given every indication, short of an outright holding, that classwide arbitrability is a gateway question [for the courts] rather than a subsidiary one [for the arbitrator]." *Id.* at 598.

In *Crockett*, an attorney, Craig Crockett, signed a contract of adhesion with LexisNexis that contained an arbitration clause. *Crockett* 734 F.3d at 596. Crockett filed an arbitration demand on behalf of himself and a putative class. *Id.* The arbitration clause was silent, however, as to the availability of classwide arbitration. *Id.*

The Sixth Circuit canvassed the state of the law in holding that "the question of whether an arbitration agreement permits classwide arbitration is a gateway

matter, which is reserved "for judicial determination unless the parties clearly and unmistakably provide otherwise." *Crockett*, 734 F.3d at 599.   These matters are important enough that courts "hesitate to interpret silence or ambiguity" as grounds for giving an arbitrator the power to decide them, because "doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide." *Id.* at 597 *citing First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 945, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).

As noted above, the Sixth Circuit aptly wrote, "[a]lthough the Supreme Court's puzzle of cases on this issue is not yet complete, the  Court has sorted the border pieces and filled in much of the background." *Crockett* 734 F.3d at 597-8. "Thus, the issue before us—whether classwide arbitrability is presumptively for an arbitrator to decide, or presumptively for a judge—remains an open one." *Id.* at 598.  The Sixth Circuit went on to observe:

> The Court has stated that "it cannot be presumed the parties consented to [classwide arbitration] by simply agreeing to submit their disputes to an arbitrator." *Stolt–Nielsen*, 559 U.S. at 685, 130 S.Ct. 1758. Indeed, for several reasons, the Court has characterized the differences between bilateral and classwide arbitration as "fundamental." *Id.* at 686, 130 S.Ct. 1758; *AT&T Mobility LLC v. Concepcion*, —— U.S. ——, 131 S.Ct. 1740, 1750, 179 L.Ed.2d 742 (2011) (same). First, arbitration's putative benefits—"lower costs, greater efficiency and speed," et cetera—"are much less assured" with respect to classwide arbitration, "giving reason to doubt the parties' mutual consent" to that procedure. *Stolt–Nielsen* at

21

685, 130 S.Ct. 1758; *see also Concepcion*, 131 S.Ct. at 1751 (stating that "the switch from bilateral to class arbitration sacrifices the principal advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to generate procedural morass than final judgment"). Second, "[c]onfidentiality becomes more difficult" in classwide arbitrations, *id.* at 1750—thus "potentially frustrating the parties' assumptions when they agreed to arbitrate." *Stolt–Nielsen*, 559 U.S. at 686, 130 S.Ct. 1758. Third, "the commercial stakes of class-action arbitration are comparable to those of class-action litigation"—indeed, Crockett seeks an award of $500 million here—"even though the scope of judicial review is much more limited[.]" *Id.* at 686–87, 130 S.Ct. 1758. And then there are the due-process concerns: once an arbitration is expanded classwide, "[t]he arbitrator's award no longer purports to bind just the parties to a single arbitration agreement, but adjudicates the rights of absent parties as well." Id. at 686, 130 S.Ct. 1758. Consequently, the absent parties "must be afforded notice, an opportunity to be heard, and a right to opt out of the class." *Concepcion*, 131 S.Ct. at 1751. Indeed, "where absent class members have not been required to opt in, it is difficult to see how an arbitrator's decision to conduct class proceedings could bind absent class members who have not authorized the arbitrator to decide on a classwide basis which arbitration procedures are to be used." *Oxford Health*, 133 S.Ct. at 2071–72 (Alito, J., concurring). Thus, in sum, "[a]rbitration is poorly suited to the higher stakes of class litigation." *Concepcion*, 131 S.Ct at 1752.

*Crockett*, 734 F.3d at 598.

Be that as it may, the "[T]he Third Circuit ha[d] repeatedly recognized that this issue is exclusively for the arbitrator to decide and this Court is bound by that precedent." *Muhammad v. Delaware Title Loans, Inc.*, 2013 U.S. Dist. LEXIS 23634, *2 (D. NJ Feb. 21, 2013) (Bumb, J.) (Internal citations omitted).   Until July 30, 2014, this Court would have ineluctably concluded the issue in

Defendants' favor, as district courts are "not at liberty to ignore the decisions of the United States Supreme Court and the Third Circuit Court of Appeals." *Williams v. Nabors Drilling USA, LP, et. al.,* 2014 U.S. Dist. LEXIS 23841, *21 (W.D. Pa. Feb. 25, 2014) (Conti, C.J.) (Internal citation omitted).  In *Opalinski v. Robert Half Int'l Inc.*, 761 F.3d 326 (3d Cir. 2014), the Third Circuit held, however, for the first time, that "the availability of classwide arbitration is a substantive "question of arbitrability" to be decided by a court absent clear agreement otherwise." *Id.* at 329.   In *Opalinski*, two men brought an action against their former employer for overtime pay.  The men had signed employment agreements, that, like the agreement at issue here, were silent on the availability of class arbitration.  The relevant clause reads, "[a]ny dispute or claim arising out of or relating to Employee's employment, termination of employment or any provision of this Agreement" shall be submitted to arbitration. *Id.*

The Third Circuit held that the "availability of class arbitration is a "question of arbitrability" that is a gateway question for "a court to decide unless the parties unmistakably provide otherwise." *Opalinaki*, 761 F.3d at 331-7.        In so holding, Judge Ambro, writing for the *Opalinski* Court stated:

> We proceed to the merits of the case and consider whether, in the context of an otherwise silent contract, the availability of classwide arbitration is to be decided by a court rather than an arbitrator. The analysis is twofold. We decide whether the availability of classwide arbitration is

a "question of arbitrability." *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002) (internal quotation marks and citation omitted). If yes, it is presumed that the issue is "for judicial determination unless the parties clearly and unmistakably provide otherwise." *Id.* (internal quotation marks, citations, and alteration omitted). If the availability of classwide arbitration is not a "question of arbitrability," it is presumptively for the arbitrator to resolve. See First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944-45, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1994).

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam*, 537 U.S. at 83, 123 S.Ct. 588 (internal quotation marks and citation omitted). While federal policy favors arbitration agreements, an arbitrator has the power to decide an issue only if the parties have authorized the arbitrator to do so. Because parties frequently disagree whether a particular dispute is arbitrable, courts play a limited threshold role in determining "whether the parties have submitted a particular dispute to arbitration, i.e., the "question of arbitrability[.]" *Id.* at 83, 123 S.Ct. 588 (emphasis in original).

"Questions of arbitrability" are limited to a narrow range of gateway issues. They may include, for example, "whether the parties are bound by a given arbitration clause" or "whether an arbitration clause in a concededly binding contract applies to a particular type of controversy." *Id.* at 84, 123 S.Ct. 588. On the other hand, questions that the parties would likely expect the arbitrator to decide are not "questions of arbitrability." Id. Those include "procedural" questions that grow out of the dispute and bear on its final disposition[,]" as well as allegations of waiver, delay, or similar defenses to arbitrability. *Id.*

*Opalinski v. Robert Half Int'l Inc.*, 761 F.3d 326, 330-1 (3d Cir. 2014).

Scout takes issue with this Court's application of *Opalinski* in its October 16, 2014 Order arguing that because the contracts at issue referenced the AAA

24

rules, the contracts were not silent on class arbitration.  The Court respectfully suggests that Scout conflates the "who decides" question with the secondary "clause construction" question.  The undersigned has not yet reached the clause construction question.  This Court has merely held that the contract did not "clearly and unmistakably provide" for class arbitration; accordingly, the Court should undertake the contract interpretation to determine if the contract does or does not allow for class arbitration.

Scout relies on a recent decision from my colleague, the Honorable Malachy E. Mannion, in what appears to be a substantially similar case involving the same plaintiff.  *See Chesapeake Appalachia, LLC. v. Burkett*, No. 3:13-CV-3073, 2014 U.S. Dist. LEXIS 148442 (M.D. Pa. Oct. 17, 2014) (Mannion, J.).[2]  It is respectfully suggested that the position of Judge Mannion and Scout is not in accord with existing and binding case law.   Scout urges that the undersigned follow the approach of Judge Mannion in *Burkett,* and rely on cases discussing clause construction to decide the "who decides" question.

The cases relied upon by Judge Mannion in *Burkett* (*Qualcomm Inc. v. Nokia Inc.,* 466 F.3d 1366 (Fed. Cir. 2006), *Terminix Int'l Co. v. Palmer Ranch*

_____

[2]The division in this District between Judge Mannion's recent holding and the decision reached by the undersigned results in this Court granting the request for language certifying an interlocutory appeal.

*LP,* 432 F.3d 1327 (11th Cir. 2005), *Contec Corp. v. Remote Solution Co.*, 398 F.3d

205 (2nd Cir. 2005)) dealt with the "who decides" question in the context of a

bilateral arbitration agreement.   Judge Mannion conceded that the cases he cited

were not directly on point to the issue at hand.  ("While it is true that the above

cases do not address the exact issue presented in this action...")  *Burkett, supra* at

14.

    Using bilateral arbitration dispute case law to make a decision in a classwide

arbitration dispute  case completely ignores the undergirding of the *Opalinski*

holding. "Because of the fundamental differences between classwide and

individual arbitration, and the consequences of proceeding with one rather than the

other, we hold that the availability of classwide arbitration is a substantive

"question of arbitrability" to be decided by a court absent clear agreement

otherwise." *Opalinski*, 761 F.3d at 329.

    Judge Mannion's analysis, and the analysis Scout urges this Court to adopt,

ignores or at least misconstrues both  *Opalinski* and the post-*Bazzle* Supreme Court

holdings; instead it skips directly to the clause construction question in order to

answer the threshold "who decides" question.  This is not the state of existing case

law in the Third Circuit.

    Additionally, the *Burkett* decision determined that because the addendum to

the lease provided for the AAA commercial rules and supplementary rules to govern arbitration, this was evidence that the contract "clearly and unmistakably provide[d]" for class arbitration pursuant to *Opalinski*. This is the evidence in the contract in the case at bar that Scout proposes that this Court consider. The undersigned again respectfully suggests that this is an erroneous analysis. The present contract references and incorporates the AAA rules, at a minimum, because the contract provides for bilateral arbitration. What *Burkett* did, and what Scout proposes that this Court do, is take a contract that clearly and unmistakably provides for bilateral arbitration and the rules that will govern bilateral arbitration, and extrapolate that evidence to "clearly and unmistakably provide" for class arbitration. This argument is unpersuasive. The contract here is silent or ambiguous as to class arbitration, far from the "clear and unmistakable" allowance needed for an arbitrator, and not a court, to turn to the clause construction question.

Moreover, this is precisely the argument the Sixth Circuit rejected in *Crockett*, a decision that the *Opalinski* Court relies upon in no small part. In rejecting Crockett's argument, the Sixth Circuit stated, in pertinent part:

> Crockett cannot make that showing [of clear and unmistakable agreement for classwide arbitration] here. The Plan's arbitration clause provides, in relevant part:

2. Arbitration

Except as provided below, any controversy, claim or counterclaim (whether characterized as permissive or compulsory) arising out of or in connection with this Order (including any amendment or addenda thereto), whether based on contract, tort, statute, or other legal theory (including but not limited to any claim of fraud or misrepresentation) will be resolved by binding arbitration under this section and the then-current Commercial Rules and supervision of the American Arbitration Association ("AAA").

The clause also provides: "Issues of arbitrability will be determined in accordance and solely with the federal substantive and procedural laws relating to arbitration[.]"

This language does not clearly and unmistakably assign to an arbitrator the question whether the agreement permits classwide arbitration. Instead it does not mention classwide arbitration at all. It is true that the clause provides that "any controversy ... arising out of or in connection with this Order" shall be resolved by binding arbitration; and one might argue that the question whether an arbitrator should decide classwide arbitrability is a "controversy ... arising ... in connection with" Crockett's order. That, indeed, was the interpretation that the plurality gave to analogous language in *Bazzle. See* 539 U.S. at 448, 123 S.Ct. 2402 (plurality opinion). But given the total absence of any reference to classwide arbitration in this clause, the agreement here can just as easily be read to speak only to issues related to bilateral arbitration. Thus, at best, the agreement is silent or ambiguous as to whether an arbitrator should determine the question of classwide arbitrability; and that is not enough to wrest that decision from the courts. *Stolt-Nielsen*, 559 U.S. at 684-85, 130 S.Ct. 1758. We therefore agree with the district court that the question whether Crockett and LexisNexis agreed to arbitrate must "be decided by the court, not the arbitrator."   *AT&T Techs.*, 475 U.S. at 649, 106 S.Ct. 1415. And so we turn to that question next.

The principal reason to conclude that this arbitration clause does not authorize classwide arbitration is that the clause nowhere mentions it. A second reason, as the district court correctly observed, is that the clause limits its scope to claims "arising from or in connection with this Order," as opposed to other customers' orders. Crockett responds that the arbitration clause refers to the AAA's Commercial Rules, which themselves incorporate the AAA's Supplemental Rules for Class Arbitration. But the Supplemental Rules expressly state that one should "not consider the existence of these Supplementary Rules, or any other AAA rules, to be a factor either in favor of or against permitting the arbitration to proceed on a class basis." Crockett also responds that the agreement does not expressly exclude the possibility of classwide arbitration, which is true enough. But the agreement does not include it either, which is what the agreement needs to do in order for us to force that momentous consequence upon the parties here.

*Crockett*, 734 F.3d at 599-600.

The absence of clear and unmistakable evidence discussed in *Opalinski* (and *Crockett*) caused the undersigned to grant Plaintiff's partial motion for summary judgment on Count I of the complaint. This Court has not decided the secondary question of clause construction, as there has been no procedural mechanism through which the Court has had the opportunity to decide whether or not the contract allows for class arbitration.

*2. Plaintiff's Motion to Vacate*

The decision of the arbitrators was vacated by this Court pursuant to 9 U.S.C. § 10(a)(4) because they exceeded their authority. The "task of an arbitrator

29

is to interpret and enforce a contract" *Stolt-Nielsen*, 130 U.S. at 1767, and

determining "whether an agreement provides for classwide arbitration is a question

of arbitrability to be decided by the District Court." *Opalinski,* 761 F.3d at 332.

Scout's further argument that it was somehow denied due process also fails.

Scout has been "given more than a full opportunity to be heard." *United States v.*

*Brownlee*, No. 2: 11-CR-00101, 2014 WL 4721828, at *2 (W.D. Pa. Sept. 22,

2014).  This Court has read every word of Scout's extensive briefs and exhibits on

this singular "who decides" issue.  The Court offered the parties the opportunity

for oral argument during the June 10, 2014 telephone conference call with the

parties.  This was declined.  The Court subsequently held oral argument, at Scout's

request, on December 10, 2014.

*3.  Defendants' Request for Certification of Interlocutory Appeal*

Because Judge Mannion in *Burkett* and I have reached diametrically

opposing conclusions on what appear to be identical issues relating to class

arbitrability, this Court will certify the matter for appeal of the undersigned's

October 16, 2014 Order pursuant to 28 U.S.C. § 1292(b).

*4.  Defendants' Motion to Vacate and for Recusal*

The undersigned came directly to the bench of this Court from the private

practice of law.  On December 3, 2014, Scout faxed to the Court a three sentence

letter with an advertisement attached that indicated that my former law firm of twenty-two years, Brann, Williams, Caldwell & Sheetz, is serving as local counsel for a Texas law firm, the McDonald Law Firm.  McDonald is apparently soliciting Chesapeake leaseholders  for possible class action lawsuit against Chesapeake.  My former law firm, which includes as its partners both my father and brother, is not a participant in the instant action.  Curiously, although it is Chesapeake that my former law firm has prospectively targeted as a potential adverse party, it is Scout who has filed the motion for recusal.

Scout hinges its request for recusal on two statutory bases.  First, Scout asks for recusal based on the "general" provision of 28 U.S.C. § 455, the statue titled "Disqualification of justice, judge, or magistrate [magistrate judge]" which states, in pertinent part, "Any justice, judge, or magistrate [magistrate judge] of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a).  Second, Scout lists as a basis for recusal the more specific section,

> He shall also disqualify himself in the following circumstances[, h]e or his spouse, or a person within the third degree[3] of relationship to either

---

[3]The degree of relationship is calculated by our civil law system, in which father and brother are both within the degrees of affinity contemplated by this statute.  Specifically, my father and I have a first degree relationship, and my brother and I have a second degree relationship.

of them, or the spouse of such a person [i]s known by the judge to have an interest that could be substantially affected by the outcome of the proceeding.

28 U.S.C. § 455(b)(5)(iii).   In addition to the statutory basis for recusal, Scout asserts that my presiding over this matter creates the appearance of impropriety in violation of the Code of Conduct for United States Judges.

As it has in the primary matter before the Court, addressed at length above, Scout overlooks precedential decisions in order to advance a position it prefers.

A party's request for the recusal of a judge is unusual.  Judges are, by and large, circumspect about their public and private reputations.  Judges are impartial arbiters of the law, and suggestions or requests, however respectfully stated, that they would act otherwise is worrisome.  A claim under Section 455 "must be supported by a factual basis, and recusal is not required based on unsupported, irrational, or highly tenuous speculation." *In re Linerboard Antitrust Litigation*, 361 F. App'x 392, 400 (3d Cir. 2010) (unpublished).

As Scout is quick to point out, the United States Court of Appeals for the Fifth Circuit has developed a *per se* rule for recusal when the relative of a judge is a partner at a law firm that represents one of the parties, although not the fact pattern here.  *Potashnick v. Port City Constr. Co.*, 609 F.2d 1101, 1113 (5th Cir. 1980).  However, the Fifth Circuit is the only circuit to have taken this draconian

approach.  "Other circuits, however, have adopted a more lenient approach.  For example, the Second Circuit allowed a judge to proceed on a case where a partner on the case was married to the judge's sister-in-law."  Jeffrey M. Hayes, To Recuse or to Refuse: Self-Judging and the Reasonable Person Problem, 33 J. Legal Prof. 85, 95 (2008), *see also Pashian v. Eccelston Properties, Ltd.*, 88 F.3d 77, 83-84 (2d Cir. 1996) ("We reject the Fifth Circuit's rule of automatic recusal."); *In re Kansas Pub. Employee Ret. Sys.*, 85 F.3d 1353, 1364 (8th Cir. 1996); *Southwestern Bell Co. v. F.C.C.*, 153 F.3d 520, 522 (8th Cir. 1998); *Datagate, Inc. v. Hewlett-Packard Co.*, 941 F.2d 864, 871 (9th Cir 1991), cert. denied, 503 U.S. 981 (1992); *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 882 F.2d 1556, 1568 (Fed. Cir. 1989), *cert. denied* 493 U.S. 1076.

Chief Justice William H. Rehnquist was faced with an nearly identical set of circumstances in *Microsoft Corp. v. United States*, 530 U.S. 1301, 121 S. Ct. 25, 147 L. Ed. 2d 1048 (2000).  While I in no way mean to compare myself to Chief Justice Rehnquist, I cite at length to the late Chief Justice's statement, as it is analogous to the question at hand. *Microsoft* involves a relative in the first degree of consanguinity who is a partner at a law firm.  Although, in *Microsoft*, Chief Justice Rehnquist's son actually represented Microsoft Corporation in other matters.  Here, the Court is faced with the odd situation of a party demanding

recusal of a judge because the judge's relatives are partners at a law firm who may in some fashion represent in the future the interests <u>against</u> the non-moving party here (but not in the instant litigation).

Chief Justice Rehnquist wrote in *Microsoft v. United States*, as follows:

Microsoft Corporation has retained the law firm of Goodwin, Procter & Hoar in Boston as local counsel in private antitrust litigation. My son James C. Rehnquist is a partner in that firm, and is one of the attorneys working on those cases. I have therefore considered at length whether his representation requires me to disqualify myself on the Microsoft matters currently before this Court. I have reviewed the relevant legal authorities and consulted with my colleagues. I have decided that I ought not to disqualify myself from these cases.

28 U.S.C. § 455 sets forth the legal criteria for disqualification of federal magistrates, judges, and Supreme Court Justices. This statute is divided into two subsections, both of which are relevant to the present situation. Section 455(b) lists specific instances in which disqualification is required, including those instances where the child of a Justice "is known . . . to have an interest that could be substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(b)(5)(iii). As that provision has been interpreted in relevant case law, there is no reasonable basis to conclude that the interests of my son or his law firm will be substantially affected by the proceedings currently before the Supreme Court. It is my understanding that Microsoft has retained Goodwin, Procter & Hoar on an hourly basis at the firm's usual rates. Even assuming that my son's non-pecuniary interests are relevant under the statute, it would be unreasonable and speculative to conclude that the outcome of any Microsoft proceeding in this Court would have an impact on those interests when neither he nor his firm would have done any work on the matters here. Thus, I believe my continued participation is consistent with § 455(b)(5)(iii).

Section 455(a) contains the more general declaration that a Justice "shall disqualify himself in any proceeding in which his impartiality might

reasonably be questioned." As this Court has stated, what matters under § 455(a) "is not the reality of bias or prejudice but its appearance." *Liteky v. United States*, 510 U.S. 540, 548, 127 L. Ed. 2d 474, 114 S. Ct. 1147 (1994). This inquiry is an objective one, made from the perspective of a reasonable observer who is informed of all the surrounding facts and circumstances. *See ibid.; In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307, 1309 (CA2 1988). I have already explained that my son's personal and financial concerns will not be affected by our disposition of the Supreme Court's Microsoft matters. Therefore I do not believe that a well-informed individual would conclude that an appearance of impropriety exists simply because my son represents, in another case, a party that is also a party to litigation pending in this Court.

It is true that both my son's representation and the matters before this Court relate to Microsoft's potential antitrust liability. A decision by this Court as to Microsoft's antitrust liability could have a significant effect on Microsoft's exposure to antitrust suits in other courts. But, by virtue of this Court's position atop the federal judiciary, the impact of many of our decisions is often quite broad. The fact that our disposition of the pending Microsoft litigation could potentially affect Microsoft's exposure to antitrust liability in other litigation does not, to my mind, significantly distinguish the present situation from other cases that this Court decides. Even our most unremarkable decision interpreting an obscure federal regulation might have a significant impact on the clients of our children who practice law. Giving such a broad sweep to § 455(a) seems contrary to the "reasonable person" standard which it embraces. I think that an objective observer, informed of these facts, would not conclude that my participation in the pending Microsoft matters gives rise to an appearance of partiality.

*Microsoft Corp. v. United States*, 530 U.S. 1301, 1302, 121 S. Ct. 25, 147 L. Ed. 2d 1048 (2000).

If either my father or brother had entered their appearances for any party in the case at bar, I would have promptly recused had the case been assigned to me.

35

Likewise, had my former law firm entered an appearance for any party in the instant litigation, I would have promptly recused, as my association with the firm ended slightly less than two years ago and included a financial buyout which was not completely effected until August 2013.  At this stage of my federal judicial career, these ties might well create the appearance of impropriety shortly after the conclusion of a two decade professional relationship.

It would seem pretty far afield to suggest, however, that even an appareance of impropriety, let along impropriety itself, exists when a judge's close relatives are partners in a law firm, formerly the judge's law firm, who <u>may</u> at some date in the future represent the interests of an unknown person or entity in litigation in an undetermined court impacted by the judge's determination today on the proper procedural approach to class arbitrability.  No reasonable or informed person could conclude that my partiality in this case could be drawn into question concerning such hypothetical litigation.   A reasonable or informed person, including a reviewer of this memorandum opinion, might, in fact, conclude that the recusal request was contrived.

Finally, the Defendant suggests that my father and brother have "interests" that may be affected by this Court's decision today regarding this pending issue of class arbitrability.  It is not at all clear to the undersigned what these "interests"

might be.  The Code of Conduct for United States Judges appears to conclude that "interests" are typically financial interests, which could be impacted, adversely or favorably, by a judge's decision.  While judges are required to be aware of their own financial affairs and those of other members of their household, including spouses and children, they are not required to be aware, or made aware, of the financial interests of parents or siblings.  Moreover, "[t]he financial interest in the subject matter in controversy must be direct, rather than speculative or remote." *Tare v. Bank of America*, 2008 WL 4372785 at *4 (D.N.J. Sept. 19, 2008).  Any non-pecuniary interests don't appear to be relevant in light of the remoteness of any potential litigation which may or may not be affected by any rulings in the case at hand.

The Court is skeptical, then, of the Defendant's actual basis for recusal in this case.  It would seem, instead, that this is, at heart, a desire for judge shopping, masquerading as an alarmed recitation of a recusal request.  The Court is deducing this for several reasons.  First, this is Scout's second attempt to have this case transferred to a different judge.  See ECF No. 20.  Second, not only is Scout asking the undersigned to recuse, it is also asking for the extraordinary remedy of vacating prior orders.  Third, this pending motion was filed at the eleventh hour, three business days before an oral argument on Scout's motion for reconsideration – an

argument that had been scheduled more than a month before.  Fourth, the motion to recuse was filed by Scout, the party who has interests in line with my former firm; it was not filed Chesapeake, the party whose interests may prove adverse to those of my former firm. The undersigned suspects that Scout may be shopping about, in hopes that Judge Mannion, or another judge who may analyze the case law in the same manner, is assigned to the case so that Scout receives a different outcome from what it previously received from the undersigned on October 16, 2014 and probably, if truth be told, expects to receive in this opinion.

As Judge Richard Posner noted recently: "[T]here is[] a serious problem of judge shopping in the disordered realm of class action litigation." *Smentek v. Dart*, 683 F.3d 373, 376 (7th Cir. 2012) (Posner, J.).   Scout is therefore admonished that "[j]udge-shopping clearly constitutes conduct which abuses the judicial process." Hernandez v. City of El Monte, 138 F.3d 393, 399 (9th Cir. 1998). "The district court's inherent power to impose dismissal or other appropriate sanctions therefore must include the authority to dismiss a case for judge-shopping." *Id.*

Lastly, Scout's request that the Court vacate it's October 16, 2014 Order is denied.   "Federal Rule of Civil Procedure [] 59(e) provides, "A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the

judgment." This Rule has been interpreted to permit a motion to vacate a judgment in addition to a motion to alter or amend it." *Daker v. Warren*, No. 1:10-CV-03815-RWS, 2012 WL 2403437, at *4 (N.D. Ga. June 25, 2012) *citing* 11 Charles Alan Wright & Arthur R. Miller, et al., Federal Practice and Procedure § 2810.1 (2d ed.); *Foman v. Davis*, 371 U.S. 178, 181, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Scout's motion to vacate was docketed some twenty-two days after the twenty-eight day entry of judgment deadline. Furthermore, "reconsideration of a judgment pursuant to Rule 59(e) is committed to the sound discretion of the district court, *Am. Home Assur. Co. v. Glenn Estess & Assocs., Inc.*, 763 F.2d 1237, 1238-39 (11th Cir.1985), but it is "an extraordinary remedy which should be used sparingly." *Daker* at *4 (N.D. Ga. June 25, 2012) *citing* 11 Wright & Miller, Federal Practice and Procedure § 2810.1.

Scout's unusual request of vacation of this Court's October 16, 2014 Order is both untimely and further evidences Scout's hope that another judge would re-decide the matter in its favor, despite controlling precedent to the contrary.

## III. CONCLUSION:

The defendants' motions for reconsideration and to vacate/recuse are denied. I will amend my prior Order granting Chesapeake's Motion for Partial Summary Judgment and denying Scout's Motion to Dismiss to incorporate this

Memorandum Opinion as the reasoning in support of that Order and will grant

defendants' request for certification of interlocutory appeal of the Court's October

16, 2014 Order.

The action will be stayed pending decision by the United States Court of

Appeals for the Third Circuit.


BY THE COURT:


/s Matthew W. Brann
Matthew W. Brann
United States District Judge